PRIEBE, d/b/a MARTIN H. PRIEBE & SON, Respondent, v. PUBLIC SERVICE COMMISSION, Appellant.

*February 27—April 12, 1968.*

636

For the appellant there were briefs by *William E. Torkelson,* chief counsel, and *Clarence B. Sorensen,* attorney, both of Madison, and oral argument by *Mr. Torkelson.*

For the respondent there was a brief and oral argument by *L. V. Kaminski* of Princeton.

A brief *amicus curiae* was filed by *Michael J. Wyngaard* of Madison, for the Wisconsin Motor Carriers Association.

ROBERT W. HANSEN, J.   The Wisconsin legislature has provided that an application for contract carrier license shall be granted or denied, as the public interest may require, upon a finding of public convenience and necessity, taking into consideration all existing transportation facilities in the territory.[1] This case asks the question, Is this statute to be interpreted as a legislative commitment to competition as the best guarantor of adequate carrier service, or as a mandate for monopoly as the best assurance of adequate service, or as neither.

The trial court decision presents the case for competition. It implies that where there is only one contract carrier in an area, there ought to be at least two to give shippers a choice and insure adequacy of service. The trial court states ". . . where the public interest requires, there may and should be competition." The decision places heavy emphasis upon the right of farmers shipping livestock to market to quality service. While not in the statute, the reference to quality of service is

---

[1] ". . . The commission, upon the filing of an application for such license, shall have power as the public interest may require, upon a finding of public convenience and necessity as to service to be performed for the public generally or any (well defined) class thereof, and of convenience and necessity as to other contract motor carrier services, to grant or deny the license prayed for or to grant it for the partial exercise only of the privilege sought, and may attach to the exercise of the privilege granted by such license such terms and conditions as in its judgment the public interests may require; . . . Before granting a license to a contract motor carrier the commission shall take into consideration all existing transportation facilities in the territory for which a license is sought. . . ." Sec. 194.34 (1), Stats., incorporating amendment made in 1945, ch. 290, Laws of 1945, effective June 12, 1945, and amendment added in 1959, ch. 586, Laws of 1959, effective November 1, 1959.

not new.[2] As a recognition that service involves schedules, frequency of pickups, time and careful handling, the reference to quality is descriptive. More than the availability of a truck to carry a cow to market may well be involved. However, the emphasis upon quality may not be used to imply that granting an additional license ipso facto increases quality of service. That is a commitment to competition as quality-engendering that has its advocates but goes beyond the legislative mandate. This is an issue of public policy that it is not for courts or commissions to decide. Both are limited by the legislative enactments, and the law, as it now is, requires consideration be given to existing transportation facilities before granting additional licenses.

Briefs on behalf of the Public Service Commission present the case against competition. They imply that, where there is one competent contract carrier in an area, there need never be two for the facilities of the one first in the field can be expanded to meet any unmet need. The commission sees its assignment from the legislature to be to ". . . make it more difficult rather than to open the way to one seeking a contract motor carrier license or amendment to an existing license where another 'private contract carrier' licensee is involved." It is argued that a contract carrier license is a valuable property right, to be protected against "diminution" by competition. It is argued that even the possibility of future competition would discourage capital expenditures to update and modernize terminals and transportation equipment. Where the trial court views competition as a virtue, the commission's briefs see it as a vice. The commission con-

---

[2] " 'The statute should be so construed and applied as to encourage rather than retard the quality of the service rendered to the public to the end that both the quality and quantity of that which is offered to the public may be improved and increased.' " *Clintonville Transfer Line v. Public Service Comm.* (1945), 248 Wis. 59, 73, 21 N. W. 2d 5.

tends that, if the trial court is sustained, almost every application for a contract carrier license would have to be granted because it might improve the quality of service by providing additional competition. It would seem as likely to follow that, under the reasoning of the commission's brief, almost every such application would have to be denied because it would involve some measure of competition to presently licensed carriers. In both the decision of the trial court and briefs of the commission, competition and monopoly are viewed as the two alternatives, and the case for each is ably presented.

We do not enter the debate as to the merits of competition vs. monopoly in the contract carrier field. The public policy in this regard is to be established by the legislature. The law is made by the legislature. The facts upon which its application are dependent are to be ascertained by the administrative agency. The interpretation of the law and review of the commission action as to reasonableness are for the courts to rule upon.

However, we do not interpret the Motor Vehicle Transportation Act, as it relates to the contract motor carrier field, to contain a legislative mandate in favor of competition or in favor of monopoly. If the legislature intended to recognize competition as a guarantor of adequacy of service, it could and would have said so. If the legislature intended to insulate existing license holders against future competitors, it could and would have said so. Up to now, it has not done so. Therefore, to start and not stray from the premise that competition is inherently good is to go beyond the legislative mandate. Likewise, to begin and never leave the concept that competition is inherently bad is to go beyond the legislative mandate.

The trial court is correct in its view that "public convenience and necessity" require consideration of the reasonable needs and wants of the farmers' group supporting the respondent's application. They are a ". . . (well defined) class . . ." of the public within the meaning of the

statute. The commission is correct in stating that "public convenience and necessity" require consideration of the impact of the application upon other contract motor carrier services with consideration to be given to ". . . all existing transportation facilities in the territory for which a license is sought." The record must be reviewed in the light of both statutory mandates. Actually, there is little dispute as to the essential facts in this case.

Priebe testified that he made his application at the request of two packing houses in Green Bay and farmers in the Green Lake area. The farmers involved are members of a farm organization centered in the town of Brooklyn who entered into an agreement for the group marketing of their livestock in Green Bay. They have a group representative in Green Bay who sells their livestock to Green Bay packing plants, almost entirely to the Liebmann Packing Company. They ship their livestock from their farms to the Central Wisconsin Livestock Cooperative in Green Bay, located across the street from the Liebmann plant. The farmers involved testified that this collective marketing arrangement has resulted in prices being secured by them more than one dollar per hundred weight over the usual market price.

As part of this cooperative marketing arrangement, the farmers involved sought a direct trucking arrangement to take their cattle from their farms to the livestock cooperative yard in Green Bay. Priebe had a license from the commission giving him authority to haul livestock from the Brooklyn area to Green Bay but only when he hauled for a certain cattle buyer in Ripon. To avoid the middleman, the farmers involved entered into a leased truck arrangement with Priebe. At the time trucking under such a lease did not require approval of the commission.[3] While legally unchallengeable at the time, this

---

[3] Sec. 194.01 (15), Stats., defining "for hire" was amended by ch. 418, Laws of 1965, effective December 8, 1965, by adding the following language: "The lease or rental of a motor vehicle to a

arrangement had practical inconveniences. Any one of the farmers involved who desired to market livestock would call the livestock cooperative in Green Bay to determine the price being paid, which fluctuated daily. If the price were satisfactory, he would so notify the cooperative which would then notify Priebe to make the pickup. The farmers involved testify they would prefer to be able to phone Priebe directly for pickups as part of a direct shipping service from their farms to the central collection point.

On the record established, it is clear that the group of farmers participating in the cooperative marketing agreement constitute a ". . . (well defined) class . . ." or group within the meaning of the statute. The reply brief of the commission concedes that a basic element involved in a case of this sort is ". . . a reasonable want and need by the public." This is correct as far as it goes, but it does not go far enough. The statute covers ". . . service to be performed for the public generally . . . ." It also specifically provides for service to be performed to ". . . any (well defined) class thereof." The group of farmers seeking direct service for their group of their livestock to a fixed collection point are such a ". . . (well defined) class."

On the record, it is equally clear that ". . . a reasonable want and need . . ." of such ". . . (well defined) class . . ." has been established. Their special needs arise from the special arrangement for collective marketing of their livestock. The trial court found that the farmer group "would lose their economic advantage" if required to join other users of Schicker's service instead of their arrangement with Priebe. Time is an important factor

person for transportation of such person's property which lease or rental directly or indirectly includes the lessor's services as a driver shall be presumed to be transportation for hire and not private carriage, except under arrangements approved by the public service commission and the motor vehicle department."

and the directness and exclusive character of the shipping service desired is not an unreasonable want or need. It is not disposed of by the availability of a general trucking service in the area, at least not short of a finding that the exact special service needed could and would be furnished. The situation is analogous to a dairy cooperative preferring a direct pickup service from its members to the processing plant rather than use of a general service that picked up milk from all of the farms in the area for delivery to all of the creameries in the area. There would be no need for taxicabs if a bus stopping on the corner made unreasonable all wants or needs for direct, quick, exclusive transportation.

This is not the whole story. What does the record establish as to the impact of granting this application upon other contract carriers and existing transportation facilities in the territory affected? The commission found "(b) there will be undue interference with efficient service by existing authorized carriers." If such finding of undue interference is substantiated by the record, the application was properly denied. No more is needed. However, we have above concluded that the legislature did not intend to create for existing license holders an absolute right to be protected against any competitors ever entering the picture. Interests of existing carriers and facilities must be taken into consideration, but this falls short of a legislative directive that those already in the field are entitled to all the business that exists or may be developed in a certain area. It is, as the commission order found, ". . . undue interference with efficient service . . ." that is involved. This court has stated "Both the state and federal statutes regulating transportation were designed to prevent imprudent, wasteful, and unnecessary duplication of service." [4] To constitute such duplication or undue interference with existing ser-

---

[4] *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 42, 56 N. W. 2d 548.

vices, some substantial impact upon present facilities must be shown.

As to other contract motor carrier services in this case, this means Schicker. The other part-time contract carrier opposing the application, Anklam, testified he owned a 1953 truck, was licensed to serve only a portion of the territory involved, and had been hauling livestock mainly to Milwaukee. In oral arguments, the attorney for the commission termed Anklam a "very minor factor in the case." There is no disputing that evaluation. As to Schicker, it is not disputed that the farmers involved never did use him to ship their cattle. The commission explained this saying, "Most of the potential shippers are unfamiliar with the service available from the objectors herein. Most of them had not shipped stock to Green Bay until the commencement of the operations by the applicant herein pursuant to the above-mentioned lease and shortly before that when the applicant was operating without any color of authority. . . . The shippers have made little or no attempt to familiarize themselves with service available from existing carriers." There is testimony by Schicker that he was willing to serve the farmers involved as additional individual customers of his general service. This falls short of an expressed willingness or ability to meet the special needs of the special group for the special service needed and wanted to implement their collective marketing agreement.

As to impact on all existing transportation facilities in the territory, to the extent that they are involved in the Green Lake-to-Green Bay shipping of cattle, it cannot be found on this record to be substantial. It is undisputed that under the leased truck arrangement, Priebe leased one of his trucks to the cooperative and drove it himself, making three to four trips per week from the town of Brooklyn territory to Green Bay. Before the agreement for the group marketing in Green Bay was entered into, the farmers involved testified they shipped to Milwaukee,

using truckers Don Clark, Russell Davis and Frank Peterson. Schicker testified on cross-examination that truckers Dean Shaefer, Hanefeld Brothers, Ross Caves, Duffy Brothers and Abendroth also have commission authority to haul from portions of the affected area. In fact, Hanefeld Brothers, Ross Caves, Raymond Reitz and Victor Dehn & Son appeared at the first hearing on the Priebe application as objectors. However, all withdrew their objections stating that they did not have an interest in the proceedings. It would appear that they do not have a substantial interest based on "undue interference with efficient service" due to substantial adverse effect on existing transportation facilities.

In ruling that the testimony in this record does not support the commission finding of "undue interference with efficient service by existing authorized carriers," we do not limit the authority of the commission to limit the privilege or franchise granted to Priebe. We do not sustain any right on the part of Priebe to transport livestock for anybody and from anywhere in the Green Lake area to Green Bay. The commission need grant no such unrestricted license. The statute clearly provides that, on the showing of public convenience and necessity, the commission may grant or deny the license applied for, or ". . . grant it for the partial exercise only of the privilege sought, and may attach to the exercise of the privilege granted by such license such terms and conditions as in its judgment the public interests may require." The modification of the trial court decision and reversal of the commission order is based upon the establishing in this case by a farmers' group of a special need for a special service to implement their special marketing agreement. Limitations on the privilege granted to ensure its being available to the farmers participating in the cooperative marketing agreement and to them only, are clearly indicated. This carves through the forest a narrow pathway, not a broad highway. The width of that path is for the commission to determine.

*By the Court.*—Judgment modified and, as modified, affirmed, with the cause remanded to the Public Service Commission for further proceedings consistent with this opinion, including the right of the commission to take additional testimony or conduct additional hearings in this matter.

WILKIE, J., took no part.